THE PEOPLE *ex rel.* Chicago Bar Association, Relator, *vs.*
A. HALE VOLLINTINE, Respondent.

*Opinion filed October 16, 1914.*

1. DISBARMENT—*what constitutes unprofessional conduct.* An attorney who advises a woman client, who is inexperienced in business affairs, to loan a large sum of money to a manufacturing concern which he knows is in an experimental stage and is already experiencing financial troubles, with the result that most of the money was lost to the client, is guilty of a violation of his duty to his client, notwithstanding the attorney invested and lost his own money in the transaction.

2. SAME—*when unauthorized use of funds is ground for suspension.* An attorney who receives from his client a large sum of money belonging to an estate, which sum, with his client's knowledge and consent, he deposits in his own account but within less than two months withdraws it for his personal use, except a small amount, is guilty of unprofessional conduct and will be suspended, notwithstanding he thereafter informed his client of the facts and several years later accounted for the money so used.

FARMER, J., dissenting.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

JOHN H. BATTEN, (S. S. GREGORY, of counsel,) for respondent.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is a proceeding instituted in this court for the disbarment of A. Hale Vollintine, an attorney residing in Chicago and practicing law under a license issued to him by this court on June 10, 1890. The information was filed by the Chicago Bar Association, and as grounds for disbarment charges respondent with a series of alleged fraudulent acts and unprofessional conduct while acting as attorney for Minnie P. Cleveland in the settlement of the estate of her deceased husband. Mrs. Cleveland was shortly after the

death of her husband, on February 8, 1904, appointed executrix of his will, and during the month of October, 1904, turned over to respondent, as her attorney, $10,795 of the funds received by her as executrix, which respondent deposited in his individual bank account.

The specific charges made against respondent in the information are, (1) that after obtaining authority from Mrs. Cleveland to loan $5000 of this money upon the representation that the loan was to be secured by real estate worth $20,000, he loaned $7500 thereof to the Search Light Manufacturing Company, an insolvent corporation in which his father-in-law was interested as a stockholder and officer, and took as security for said loan bonds issued by said corporation of the par value of $7500 but which had but little real value, the loan being evidenced by two promissory notes executed by said company, one for $2500, due three months after date, and the other for $5000, due one year after date; (2) that the $2500 note was not paid when due, and that shortly after the $5000 note became due the respondent, without consulting Mrs. Cleveland, canceled and surrendered to said company the two notes above mentioned and accepted in satisfaction of the indebtedness evidenced thereby the bonds which had been given as security for said notes and which respondent well knew were not worth par; (3) that thereafter, on June 20, 1906, respondent fraudulently advised and induced Mrs. Cleveland to make a further loan of $1500 to said company, well knowing that said company was in straitened circumstances and that any loan to or investment in the business of said company was a dangerous and hazardous loan or investment, and that in order to procure the money to make this loan respondent induced Mrs. Cleveland to borrow $1500 from a bank and to execute her note therefor; that subsequently the property of the company was sold upon foreclosure of the bonds which had been issued by it, and respondent received out of the proceeds of sale, on account of the bonds taken by him in

satisfaction of the original $7500 loan, the sum of $1500, which he used in paying the $1500 note above mentioned which Mrs. Cleveland had given to the bank on June 20, 1906; that by reason of the transactions above mentioned Mrs. Cleveland lost $7500 of the funds belonging to the estate of her deceased husband; (4) that within a short time after Mrs. Cleveland turned over to respondent the $10,795 above mentioned, and after respondent had loaned to said company $7500 thereof, he withdrew from the bank and used the balance of said money in payment of his personal obligations, thereby fraudulently converting such balance to his own use without the consent or knowledge of Mrs. Cleveland; (5) that respondent delayed the settlement of the estate of Mrs. Cleveland's husband for a period of almost five years, although Mrs. Cleveland from time to time called upon him to attend to his duties in said matter; (6) that respondent failed and refused to account for the money turned over to him by Mrs. Cleveland, and she was compelled to, and did, employ other attorneys to take up the matter with him, and was compelled to, and finally did, file with the grievance committee of the Chicago Bar Association a complaint against him, and that soon thereafter respondent made an accounting of the disposition of the funds placed in his hands.

In his answer the respondent admits his employment by Mrs. Cleveland and the receipt of the $10,795 by him. He admits loaning $7500 of this money to the Search Light Manufacturing Company and taking bonds of the company of the par value of $7500 as security therefor, but denies that he told Mrs. Cleveland that the loan was to be $5000 or that it was to be secured by $20,000 worth of real estate. He denies that he fraudulently used the balance of the money, or any part thereof, for his own use, but alleges that while he did make some drafts upon this balance for his own use, this was done with the consent and acquiescence of Mrs. Cleveland, and that he has fully accounted for all

the money he received from her. He admits that his father-in-law, at the time the original loan of $7500 was made and when the other transactions were had with the Search Light Manufacturing Company, had money invested in the company and was secretary thereof. He alleges that before making the loan of $7500 he conferred with his father-in-law about the affairs of the company and visited and inspected the plant, and from the information thus obtained believed that the company was in a good financial condition and that its bonds were good security for the loan; that after making this loan he ascertained that the company was financially embarrassed and needed more capital, and in June, 1906, various persons interested in the company agreed to furnish more money in order to re-organize the company and make it a profitable enterprise; that he explained the situation to Mrs. Cleveland, and she agreed to put in, and did put in for that purpose, $1500, and shortly thereafter surrendered her notes which she held against the company and took its bonds in satisfaction thereof for the purpose of increasing the available capital and reducing the liabilities of the company; that thereafter the trust deed securing the bonds issued by the company was foreclosed and respondent received for Mrs. Cleveland her *pro rata* share of the proceeds of sale, amounting to $1642.19, out of which he paid the $1500 note given by her to the bank and has fully accounted to her for the balance. Respondent further says by his answer, that before obtaining authority to loan the $7500 to the Search Light Manufacturing Company he informed Mrs. Cleveland of the investigation he had made and the information he had received regarding the company and its financial condition; that Mrs. Cleveland at all times thereafter had full knowledge of all the transactions that he had with the company in her behalf, and that he never consciously or wittingly deceived her in regard thereto in any respect. He further alleges that the delay in settling her husband's estate was with the acqui-

escence of Mrs. Cleveland, and that she did not, until near the middle of the year 1911, demand any accounting from him; that when such demand was made for an accounting he explained to her that it would require some time to prepare an itemized statement, as he had not kept a regular account with her and would be compelled to go over the items themselves, which he proceeded to do, and in November, 1911, rendered her an account showing the disposition made of all moneys in his hands except payments for taxes and assessments upon her real estate and one or two other small items.

Upon the filing of the answer we referred the cause to a commissioner, who afterwards filed a report, together with the evidence offered by the respective parties before him. The commissioner finds that since receiving his license to practice law in this State respondent has been engaged in the practice of law in Chicago, and that his reputation for integrity as a man and as a lawyer has been good and was never questioned until the proceedings were brought before the Chicago Bar Association which resulted in the filing of the information herein; that on February 8, 1904, one Richard J. Cleveland, of Chicago, died leaving a will, which had been drawn in 1899 by respondent, who was one of the witnesses thereto; that Minnie P. Cleveland, the widow, was named as executrix; that the will was admitted to probate on March 22, 1904, and letters testamentary were at the same time issued to Mrs. Cleveland; that respondent had known Richard J. Cleveland for a long time and had transacted some business for him during his lifetime, and he also had some slight acquaintance with Mrs. Cleveland; that after the death of her husband Mrs. Cleveland employed respondent to act for her as attorney in the settlement of her husband's estate, and that respondent, as her attorney, conducted the proceedings in said estate from the filing of the petition for letters until the final settlement of the estate; that the personal assets

of the estate consisted principally of certain shares of stock, which were sold for $10,795; that said sum was paid by the purchaser of the stock to respondent with checks payable to Mrs. Cleveland; that the respondent delivered the checks to Mrs. Cleveland, who indorsed them and handed them to respondent, at the same time requesting him to deposit them in his bank account, as she had no bank account; that respondent, on October 10, 1904, deposited these checks in the Western Trust and Savings Bank of Chicago and they were credited to his account; that on November 4, 1904, respondent, acting for and on behalf of Mrs. Cleveland and with her knowledge and consent, made a loan of $7500 out of this fund in his hands to the Search Light Manufacturing Company, then located at Benton Harbor, Michigan, which loan was evidenced by two notes of the company, one for $2500, due ninety days after date, and the other for $5000, due one year after date, and soon thereafter seventy-five bonds of the company, each of the par value of $100, were delivered to respondent as security for said notes; that prior to making said loan respondent talked with W. A. Burch, the treasurer of the company, whom he had known for a great many years, and with Howard E. Clark, the president of the company, whom he had met through Burch, and with W. B. Goodenough, respondent's father-in-law, who in June, 1904, had invested some money in the company and who thereafter was for several years secretary of the company, relative to the condition of the company, its assets and liabilities, its present and prospective business, and its bond issue of $35,000, and was assured by them that the business was in such condition that with some additional capital its success would be assured; that respondent relied upon the information so furnished him and went to Benton Harbor and looked at the plant and called upon the cashier of the Benton Harbor Bank and was assured by him that the proposed loan was a safe one; that respondent was also furnished by the

officers of the company with a statement showing assets over liabilities, the details of which are not in evidence; that he reported the investigation he had made and the result thereof to Mrs. Cleveland, who told him to make the loan of $7500 if he thought it was a safe one, and that respondent then made the loan.

With reference to the company to which this loan was made, the commissioner finds that it was organized in Chicago in 1901 by Howard E. Clark, who purchased an old charter under which the authorized capital stock was $2,000,000 but which was afterwards reduced to $100,000; that it was authorized to manufacture novelties, lamps, lighting systems, gasoline engines and hardware specialties; that the business was operated in a small way in Chicago until 1903, when the company purchased from one Emil Rudert four lots in the city of Benton Harbor improved with a two-story brick factory building; that soon after this purchase the company moved to Benton Harbor; that the purchase price of this property was $16,000, of which $2000 was paid in cash and stock of the company was deposited with the Union Trust Company of Chicago as security for the payment of the balance; that on March 2, 1904, the company executed a trust deed to certain trustees conveying the real estate acquired from Rudert, and all machinery and tools therein, to secure bonds of the company to the amount of $35,000, each bond being of the par value of $100, due March 15, 1914, and bearing interest at the rate of six per cent; that on May 5, 1904, the Benton Harbor State Bank loaned said company $10,000 and received the company's note for that amount, indorsed by Clark, Burch and three other persons, and as security for said note the company delivered to the bank three hundred and twenty of said bonds of the total par value of $32,000, the bank agreeing that as often as $100, or any multiple thereof, with interest, should be paid on the note, bonds of the face value of three times the amount of such payment should be released and

delivered to the company; that the remaining thirty of said bonds were retained by the trustees for the benefit of Rudert; that on May 12, 1904, Rudert filed his bill in the circuit court of Berrien county, Michigan, charging the officers of the company with fraud and a conspiracy to cheat him by issuing the bonds above mentioned, and obtained a temporary injunction restraining the company and the Benton Harbor State Bank from disposing of the bonds; that thereafter, on September 28, 1904, a consent decree was entered in that cause, finding that the bond issue was valid and directing the trustees to deliver to Rudert the thirty bonds retained by them for his benefit and the bank to deliver to him seventy of the bonds held by it, and the company to execute to Rudert its note for $641.67, due May 1, 1905; also ordering Rudert to release to the company all stock held by the Union Trust Company as security for the balance due him on the purchase price of the property sold to the Search Light Manufacturing Company, and decreeing that the settlement so directed should be a release of all claims and demands by Rudert against the company.

The commissioner further finds that during the summer of 1904 the business of the company was impaired by the pendency of the Rudert suit and the injunction granted therein, and that by reason thereof the company was prevented from meeting its pay-roll, and as a result thereof most of its employees refused to continue their work; that when the Cleveland loan of $7500 was made, in November, 1904, the company had from fifteen to twenty men in its employ at the plant; that it was engaged in manufacturing and selling street lights, chiefly selling them to towns on time and taking municipal paper as security for deferred payments, and that this paper was discounted or placed as collateral security for loans made to the company by various persons; that the company had also up to that time manufactured somewhat less than one hundred gasoline engines of from five to seven horse power, for the use of

264 — 38

farmers and small shops, and that because it did not possess the capital necessary to purchase material, pay the cost of production and carry the municipal accounts, it pursued the method of discounting its paper and making small short-time loans; that prior to making the loan of $7500 above mentioned respondent had not been and was not a stockholder or officer of the company, but he had at the solicitation of Clark and Burch procured a few small short-time loans for the company; that in June, 1904, he procured for the company a loan of $540 for thirty days from an office associate, for which the company gave its note for $590, which note respondent indorsed, and that this note was paid in full shortly after it became due; that respondent had also made other small loans to the company, either of his own money or on behalf of his clients, some of which were renewed when they became due, and on November 4, 1904, when he made the $7500 loan, he held notes against the company aggregating $1070.

The commissioner further finds that the assets of the company on November 1, 1904, as carried on the books of the company, totaled $108,339.77, consisting of valuations of $30,000 placed upon the real estate purchased from Rudert, $9986.39 placed upon the machinery, tools and equipment, $3088.40 placed upon office furniture and stationery, $11,716.89 placed upon materials and unfinished goods, $47,910.92 placed upon patents, franchises and good will, $3541.39 due upon accounts from customers, $565 due upon notes, and the balance of $1530.78 in the form of accounts due from individuals; and that the liabilities, totaling $101,403.60, consisted, aside from $68,000 for capital stock, of bills payable amounting to $22,968.55, pay-roll amounting to $1760.21, and amounts due various individuals totaling $7036.50, of which $2369.90 was due to respondent's father-in-law and $330.69 to Clark, and that the remaining $1638.34 was charged under liabilities because

that amount of uncollectible accounts was carried among the assets of the company.

The commissioner further finds that from the company's books it appears that the company operated its business from March 1, 1904, to November 1, 1904, at a loss of approximately $5000, and that on November 4, 1904, the Drexel State Bank and the Addison State Bank held over-due notes of the company aggregating several thousand dollars. He further finds that in the summer of 1904 Good-enough, respondent's father-in-law, investigated the affairs of the Search Light Manufacturing Company and there-after invested approximately $2000 in its business and became its secretary and held that office in November, 1904, and that respondent had known him since 1889 and relied upon his judgment in business matters.

With reference to the consummation of the $7500 loan, the commissioner finds that respondent, on November 4, 1904, gave his check for $7500 on the Western Trust and Savings Bank, payable to Burch, treasurer of the company, and received the two notes above mentioned; that the officers of the company then paid $2500 of the money received from respondent to the Benton Harbor State Bank in order to obtain the release and delivery of seventy-five of the bonds held by that bank under the arrangement above referred to, by which the bank was to release three bonds for every $100 paid on its note, and after obtaining these bonds delivered them to the respondent as security for the $7500 loan; that the respondent placed the notes and bonds in a box in his office vault to which Mrs. Cleveland had access, and that on several occasions thereafter she called at his office and looked over the papers in that box. The commissioner further finds that no part of the $7500 loaned to the Search Light Manufacturing Company was ever paid to or received by respondent as compensation, commission or otherwise, and that respondent received no compensation from said company for said loan; that the note for $2500,

which was due in ninety days, was not paid when due; that
respondent made demand on the officers of the company
and was informed that they could not pay it; that the com-
pany was in financial straits and that a suit would result in
great loss to the creditors and stockholders of the company;
that Clark assured respondent that if given time the com-
pany would pay the note, and that, relying upon this as-
surance, respondent did not bring suit; that from that time
on respondent took an active personal interest in the affairs
of the company, assisted the officers in procuring loans,
cashed its checks, loaned it money and rendered personal
services in settling claims against the company and in pro-
curing extensions of time with the hope of placing the
company in a solvent condition and preventing a loss to
Mrs. Cleveland; that the condition of the company contin-
ued to grow worse, and when the note for $5000 became
due respondent was told, and in fact knew from his knowl-
edge of the company's affairs, that the company could not
pay the note; that thereafter respondent continued to co-
operate with the officers of the company, appearing for it
in suits brought against it and holding conferences with at-
torneys who represented creditors of the company, but that
he was never, at any time, the regular attorney and counsel
for the company and received no salary, retainer or com-
pensation for his services; that on June 20, 1906, in an
effort to save the company from financial ruin, the follow-
ing agreement was made:

"We, the undersigned, whose names are here set forth and here-
to subscribed, agree to pay into the treasury of the Search Light
Manufacturing Company, and take preferred stock of said company
at par for same, the amount set opposite our names, respectively:

| | |
|---|---:|
| Minnie P. Cleveland | $1500.00 |
| Howard E. Clark | 1100.00 |
| A. H. Vollintine | 1000.00 |
| W. B. Goodenough | 650.00 |
| W. A. Burch | 500.00 |
| Judson S. Richards | 500.00 |
| Mary H. Bovee | 300.00 |
| C. C. Bishop | 300.00 |

"It is agreed by and between each and all parties hereto, that A. Hale Vollintine, with offices at room 420 Ashland block, Chicago, Illinois, shall act as trustee to receive and disburse said moneys so received by him in the interests of the said Search Light Manufacturing Company which shall be paid in under this subscription."

The commissioner finds that the plan which resulted in the signing of this agreement originated with Clark, who submitted it to respondent and who conferred with Mrs. Cleveland about it, and that she and respondent agreed to it; that respondent paid in the $1000 subscribed by him, paying part thereof in cash and the balance by credits for money previously advanced to the company by him; that in order to obtain the money for Mrs. Cleveland to pay her subscription of $1500 he procured a loan of that amount from the Addison State Bank for Mrs. Cleveland, and she executed her collateral note for that amount, dated June 20, 1906, due in nine months, at six per cent interest, and delivered to the bank forty-five of the seventy-five bonds of the company which respondent held for her as collateral security; that respondent received the $1500 from the bank upon the note executed by Mrs. Cleveland, and, pursuant to the agreement above set out, disbursed the money on behalf of the company; that Judson S. Richards paid respondent $267.50 on account of his subscription of $500, which money was likewise disbursed by respondent; that it does not appear that any of the other subscribers to said agreement paid anything on account of their subscriptions; that as a part of said plan to reduce liabilities, respondent, after consulting with Mrs. Cleveland and obtaining her consent, surrendered the two notes, aggregating $7500, against the company and took the seventy-five bonds for her in payment thereof.

The commissioner further finds that subsequent to November 4, 1904, respondent advanced to said company, of his own funds, $7316.75, which has never been re-paid; that the combined efforts of respondent and the other par-

ties. failed to save the company, and that in 1907 the trust deed was foreclosed and the property covered thereby, including the real estate, machinery and tools, was sold for $8400, of which Rudert received $3252.50, the Benton Harbor State Bank $3359.61 and Mrs. Cleveland $1642.19; that Mrs. Cleveland executed a power of attorney to Goodenough on October 17, 1907, empowering him to receive her share of the proceeds of sale, and that with this money respondent paid the note of $1500 to the Addison State Bank and paid the small balance to Mrs. Cleveland; that the $7500 loan made by Mrs. Cleveland to the company was entirely lost in the wreck, and that she received no part of the principal and no interest thereon.

The commissioner further finds that after making the loan of $7500 to the Search Light Manufacturing Company respondent had $3295 belonging to Mrs. Cleveland, as executrix, in his bank account; that Mrs. Cleveland had requested him to retain it and pay claims against the estate, costs and taxes, and make a settlement when the estate should be closed; that subsequent to November, 1904, respondent paid to Mrs. Cleveland at various times, out of this money, $565, and made other payments and disbursements on her behalf and for said estate, as shown by the statement finally rendered by him to her; that shortly after November, 1904, respondent applied to Mrs. Cleveland for a loan and was told by her to use some of the money he had and account for it when the estate was settled, and that thereafter respondent did use some of this money by checking against it from time to time for his personal needs; that Mrs. Cleveland also loaned him other money from time to time, all of which seems to have been re-paid; that the final report in said estate was not filed until January 20, 1909, after a citation had been issued by the probate court against Mrs. Cleveland; that respondent also delayed rendering a complete statement and account of his transactions with Mrs. Cleveland, and that she consulted an attorney at

Joliet, Illinois, who corresponded with respondent at intervals from May to November, 1911, but was unable to obtain such statement, and that no statement was rendered by respondent until after this matter was presented to the Chicago Bar Association.

The commissioner reports as his conclusions that in view of the condition of the company on November 4, 1904, as now disclosed, the loan of $7500 should not have been made; that it was largely because of respondent's confidence in Clark, Burch and Goodenough, and because he was without experience and judgment in such matters, that he failed to require a complete and accurate statement of assets and liabilities, duly substantiated, before making the loan; that respondent was not guilty of bad faith in advising and making the loan for Mrs. Cleveland; that he did not profit from the loan, either directly or indirectly; that by bringing suit against the company when the first note became due he would have hastened the failure of the company, which he sought to avoid, and would have realized very little, if anything, for Mrs. Cleveland; that the surrender of the notes and the transfer of the seventy-five bonds to Mrs. Cleveland's name was one of many attempts made to reduce the indebtedness of the company, other than on bonds and stock, and bring it more nearly within reach of necessary capital to run the business, and that respondent's advice in this matter was not actuated by bad faith on his part nor was there any attempt on his part to personally profit thereby; that respondent appeared as attorney of record for the company in some cases, counseled with its officers, assisted in procuring loans, procured extensions of loans, assisted in compromising claims against the company, loaned money to the company, made good its checks with his own money or that which he borrowed, and gave a large amount of his time and services to the company without compensation, in a continuous effort to rescue the company from approaching ruin, and that he was mani-

festly moved to do all this in order to rectify the error he had made in advising and making the $7500 loan; that the other matters set forth in the information are largely, if not entirely, traceable to this loan and respondent's subsequent labors to protect the same; that he drew on the balance of this fund in his hands with the consent of Mrs. Cleveland, borrowed money from her and others and used much of it in assisting said company in the manner aforesaid; that he was continuously in arrears on his personal obligations, allowed some of the Cleveland real estate to be sold for taxes and subsequently redeemed the same at his own expense, delayed the payment of estate claims and the final settlement of the estate, because of his inability to repay the money he had used and because he was endeavoring to place said company in a going condition and realize on said $7500 loan; that Mrs. Cleveland permitted him to use part of this money as a loan and loaned him other money from time to time, and as to these matters treated him as her debtor and not as her attorney, with full knowledge that he was personally using such money; that nowhere in the record does there appear any logical motive on the part of respondent by which all of his acts and conduct can be consistently measured other than a continuous desire on his part, at great sacrifice of his time, labor and money, to save the company and thus rectify the error in advising the original loan.

Relator filed objections to the report, which were overruled by the commissioner, and the same have been renewed as exceptions in this court.

The first and principal objection urged to the commissioner's report is, that he finds Mrs. Cleveland authorized respondent to loan $7500 of the funds instead of $5000, as claimed by her, and further finds that respondent believed that this was a safe loan and communicated to her all the information that he possessed regarding the condition of the company immediately prior to making the loan. The

testimony of Mrs. Cleveland concerning these matters is in direct conflict with that given by respondent. According to her testimony she authorized respondent to loan but $5000 of the funds in his hands, and such authority was given at his solicitation and upon his assurance that it was to be secured by $20,000 worth of real estate. She testified that he represented that the loan was to be made for one year and that the interest was to be ten per cent; that at no time prior to making the loan did he tell her the name of the company, or that his father-in-law was interested therein, or that the company had been borrowing money at usurious rates of interest from and through him. She further testified that the first conversation she had with respondent concerning this loan after it was made was in November, 1905, when she asked him about the interest, and that he told her he had not received the interest but would have it in a few days; that shortly afterwards she went to Madison, Wisconsin, and from there wrote respondent, directing him to send the interest to her at Madison; that she received a reply from him some time during the same month, in which he told her he had received the interest but had used it in paying a note for $500 which a Mrs. Ring held against her; that she afterwards found that this was not true, as respondent had not paid the Ring note. She claimed to have burned this letter which she says she received from respondent. She further testified that she next saw respondent in the spring of 1906, when she went to his office and asked to see the papers securing the note. While there does not seem to be any direct testimony on the subject, the inference from Mrs. Cleveland's testimony is that it was at this time that she learned the name of the company to which the note had been made, and shortly thereafter she learned that respondent's father-in-law was interested in the company. After detailing the circumstances under which she claims she was induced by respondent to advance the additional sum of $1500 to the company,

she testified that during the latter part of the year 1908, or early in 1909, she became suspicious of the transactions and through a friend obtained a report from a mercantile agency, and from this report she learned that the company had failed; that she then called upon respondent and asked him what had become of her $5000, and that he then for the first time informed her that he had loaned $7500 instead of $5000 to the company and that the company had failed. On the other hand, respondent testified that Mrs. Cleveland authorized him to loan $7500 of the funds in his hands after he had told her the name of the company desiring the loan and had given her all the information he had obtained regarding the condition of the company.. He admitted that he had advised and recommended the making of this loan, but claimed that he did not know the actual financial condition of the company at that time and that he thought the loan was a safe one. It is impossible to determine from his testimony just what investigation he did make regarding the affairs of the company and just what information he had obtained before advising the making of this loan. His father-in-law had previously invested between $2000 and $3000 in the company, the nature of the investment not being clearly shown, but inasmuch as the books of the company show that on November 1, 1904, there was due from the company to Goodenough $2369.60, this investment was presumably in the nature of a loan to the company, and it appears from respondent's testimony that the money thus invested by his father-in-law represented practically all that he had accumulated during his lifetime. In one part of his testimony respondent states that his investigation into the affairs of the company before advising Mrs. Cleveland to make this loan was conducted through his father-in-law, who reported to him the condition of the company as he found it and also furnished him the names of certain banks which had made large loans to the company, but he was unable to remember the details

of the information so furnished him. In another part of his testimony he says that it was a year or two after he had made the loan on behalf of Mrs. Cleveland before he found out the condition of the company. In still another part of his testimony he says that he visited the plant at Benton Harbor, made an investigation as to the indebtedness of the company and ascertained from the officers of the company their judgment as to the value of the plant and received from them a verbal report of the assets and liabilities of the company; that he does not remember the details of this report but that it must have shown assets over liabilities; that he reported, in a general way, the result of this investigation to Mrs. Cleveland and advised her to authorize him to make the loan, which was done. Respondent further testified that he first heard of the Search Light Manufacturing Company in 1903, but does not remember what information he received concerning the company at that time; that the first relation he ever had with the company was to loan it some of his own money in 1903, but he does not remember whether it was $500 or $1000 that he loaned at that time; that up to November 4, 1904, he had loaned the company from $2000 to $3000, but does not remember what amount the company owed him at that time. Upon being asked concerning certain entries appearing upon the books of the company in the handwriting of his father-in-law showing discounts allowed and commissions paid to him on account of short-time loans made by or through him to the company prior to November 4, 1904, he replied that he did not remember anything about those transactions, but that whatever the books of the company showed with reference to those transactions was correct.

In view of all the circumstances appearing in connection with the loan of $7500 by respondent to the Search Light Manufacturing Company we think the account given by Mrs. Cleveland of the transaction is the more reasonable one. While respondent insists that he was authorized to

loan $7500 to this company, the fact that $5000 of this amount was loaned for a period of one year and the $2500 for but ninety days seems to us significant and as tending strongly to corroborate Mrs. Cleveland's testimony that the loan was to be $5000. Especially is this true when considered in connection with the fact that the bonds of the company were at that time deposited as collateral security with the Benton Harbor State Bank under an agreement that the company could obtain the release and surrender of three of the bonds for every $100 paid on the indebtedness to the bank, and that the company necessarily required the $2500, which was loaned for ninety days, in order to obtain from the bank sufficient bonds to deposit with respondent as collateral security for the loan. That respondent must have known that these bonds were held by the bank under the arrangement above mentioned and that the $2500 was to be used to obtain seventy-five of those bonds, is evident from the fact that it was not until several days after the loan was made and the notes delivered to him that he received the bonds to hold as collateral security. Under these circumstances we think it fair to conclude, in connection with the testimony of Mrs. Cleveland, that the loan of $2500 was made by respondent out of the funds in his hands in order that the company might obtain the bonds to use as collateral security for the $5000 loan, and that this was done with the expectation on the part of respondent that the $2500 would be paid when due and that Mrs. Cleveland would never know that it had been made.

Not only do we believe that this $2500 was loaned without authority from Mrs. Cleveland for the reasons above mentioned, but we are also of the opinion that respondent was guilty of a gross violation of duty in advising Mrs. Cleveland to loan the $5000 to the Search Light Manufacturing Company. It is extremely improbable that a lawyer with fourteen years' experience in the practice of law could conscientiously believe that a loan of that amount to a

manufacturing concern in the experimental stage, which had found it necessary to solicit small short-time loans at usurious rates of interest and to pay relatively large commissions for such loans and to renew them when they became due, could be a safe loan. The evidence of disinterested persons is to the effect that for a period of over six months prior to making the Cleveland loan respondent was in frequent consultation with Clark and Burch at his office in Chicago, and it was generally understood among his office associates that he was during the summer and fall of 1904 actively engaged in helping the Search Light Manufacturing Company. The books of the company show that in June, 1904, he negotiated a loan from one of his office associates of $550 for the company, due in thirty days, for which the company gave its note for $590, which was indorsed, and thus guaranteed, by respondent, and that in addition to this discount of $40 respondent was paid $55 for his services in procuring this loan. In July, 1904, the books of the company show respondent was paid a commission of $25 and $10 interest on a loan of $500 procured by him. In October, 1904, the books show another payment of $50 to respondent as a commission for obtaining a fifteen-day loan of $500 for the company, and again on November 1, 1904, a payment of $35 appears to have been made to respondent for some service rendered by him for the company. The conclusion naturally to be drawn from these facts is entirely inconsistent with respondent's claim that he was not aware of the financial condition of the company at the time he made the loan for Mrs. Cleveland. While his motive may not have been to derive any personal benefit from the transaction, he was at least in part moved to make this precarious loan because of his desire to assist his father-in-law, who had invested practically all his savings in this venture, and his friend Burch, who was interested therein, in making a success of the business, and in order to do this he was willing to advise his client to loan her money to this

insolvent corporation, well knowing that the money would be lost unless the business of the company should in the future prove a success. Under such circumstances an attorney is guilty of a grave violation of professional duty in advising a woman who is inexperienced in business affairs, as Mrs. Cleveland then was, and who necessarily places great confidence in her attorney in such matters, to make such a loan.

While it is undoubtedly true that it was because respondent had made the original loan that he afterwards advised Mrs. Cleveland to invest an additional $1500 in the company in the hope that the business might yet prove successful, the circumstances under which this money was obtained from her and disbursed by respondent while he was acting as her attorney show a willingness on his part to sacrifice his client's interests in order to help others. It will be observed from the commissioner's report that Mrs. Cleveland was the largest subscriber to the fund which it was sought to raise to save the company from financial ruin. The evidence does not disclose that Mrs. Cleveland was advised as to the amounts which the other interested parties would subscribe. It is not shown that she ever saw the subscription list which was signed or the agreement in which it was embodied. The original was not offered in evidence but a copy thereof was produced, and respondent testified that he did not know whether Mrs. Cleveland signed the document or whether she authorized him to sign it for her. She testified that she agreed to invest this $1500, or loan it to the company, upon respondent's representation that the company was unable with its available cash to supply the demand for its products; that it needed more money for that purpose, and that if she would furnish that amount the company would be able to re-pay the loan which she had theretofore authorized him to make and which she then believed was $5000. Respondent in one part of his testimony stated with reference to this transaction, "I represented to

her that I wanted this loan of the second $1500 to increase
the volume of the business," although in other parts of his
testimony he says the whole matter was fully explained to
her.   Clark and respondent seem to have been the persons
who determined upon the method of raising more money
for the company by obtaining subscriptions for preferred
stock, and they fixed the amount which each person inter-
ested was to be asked to subscribe.   Respondent says that
these amounts were not fixed with reference to the interest
in the company but with reference to what amount each
might be willing and able to take care of, and that he repre-
sented Mrs. Cleveland in fixing the amount to be subscribed
by her at $1500,—the largest amount to be subscribed by
anyone.   After obtaining these various subscriptions the re-
·spondent collected Mrs. Cleveland's subscription by having
her sign a note for $1500 and then obtained the money
from a bank upon this note, and instead of collecting the
amounts subscribed by the other persons before disbursing
the money received from Mrs. Cleveland, he proceeded to
pay out the $1500 upon the company's indebtedness and
permitted the other parties to the agreement to escape pay-
ing their subscriptions.   This conduct is not consistent with
the theory that respondent's sole motive in this transaction
was to serve the interests of his client, but shows a serious
disregard of the duty which he, as her attorney and adviser,
owed to her.

Only one other matter need be mentioned.   Respondent
claims that Mrs. Cleveland authorized him to use the bal-
ance of the money remaining in his hands after loaning
the $7500, to meet his personal obligations.   According to
Mrs. Cleveland's testimony, when the $10,795 was turned
over to respondent it was with the understanding that he
was to loan $5000 thereof and retain the balance to pay the
debts against the estate, and she testified that she did not
know he was using the money for his own necessities; that
he never told her he was using it.   She further testified

that in 1906, after frequent attempts to get respondent to pay two notes—one for $600 and the other for $1600—which had been filed and allowed against the estate, she borrowed the money necessary to pay those claims and mortgaged real estate which she owned, as security for the loans. Respondent testified that when Mrs. Cleveland delivered to him the $10,795 she told him to take care of the money and put it in the bank and use whatever was necessary to take care of the estate, and that this was all that was said about it at that time. Referring to the occasions in 1906 when Mrs. Cleveland called upon him to pay the two notes against the estate he testified: "These two notes were claims allowed against the deceased's estate and were properly payable out of this fund of $11,000 which was estate money, and a portion of this money—$3000 or $4000—at this time still due to the estate and the executrix, Mrs. Cleveland, I had in some chaotic state there, but I could not turn over the money and made some satisfactory explanation to her about it; I do not recollect the nature of that explanation." Again, referring to the same time, he testified: "She did not know I was using this money; nothing was said about that at that time." He further testified that after Mrs. Cleveland had delivered the $10,795 to him he asked her to loan him some money, and that she directed him to use the money in his hands as he needed it and afterwards account for it. Mrs. Cleveland denies this, and says that he said nothing to her about borrowing money from her until after she had been compelled to pay the two notes against the estate, in 1906, and that thereafter she did loan him money from time to time, but not out of this fund. Respondent's account with the Western Trust and Savings Bank was offered by relator, and it appears therefrom that on October 10, 1904, respondent deposited with said bank $10,795; that his balance on November 30, 1904, was $282.37, and on December 31, 1904, $187.78. It thus appears that respondent used all except $282.37 of the bal-

ance of the money entrusted to his care by Mrs. Cleveland, after loaning $7500 thereof to the Search Light Manufacturing Company, within less than two months after he had received it, well knowing that it was estate money and would be needed to pay debts against the estate. Our conclusion from a consideration of all the evidence upon this subject is that respondent used this balance without the knowledge or consent of Mrs. Cleveland, and the fact that he may have afterwards informed her of this fact, and that the statement rendered to her in 1912 shows that he now has none of the funds in his hands and has fully accounted for the same, does not exonerate him from the charge that in using this fund he was guilty of a violation of his duty as an attorney. .

For the reasons above stated, the exceptions to the commissioner's report are sustained and the respondent is suspended from practice as an attorney for a period of one year and until thereafter permitted to resume practice by order of this court.

*Respondent suspended.*

Mr. JUSTICE FARMER, dissenting:

I do not agree with the decision in this case. Suspension of respondent is not justified unless he was influenced by improper motives in the transactions complained of. If his motives were corrupt he should be disbarred; if they were not, the rule should be discharged. I think the most the proof shows is that respondent's judgment proved to have been bad. He did not profit anything by the loans made on behalf of his client. In fact, he loaned the same corporation a considerable amount of his own means without security and the same was lost. I am convinced respondent acted in good faith, and much as the results of his transactions in loaning the money are to be regretted, I do not think this suspension warranted. In my opinion the rule should be discharged.