# Ernst Heinrich and Ida Heinrich, Appellees, v. J. W. Norton and John A. Dickson (Impleaded), Appellants.

## Gen. No. 6,815.

1. APPEAL AND ERROR, § 1395*—*when chancellor's findings will not be disturbed on appeal.* The findings of fact by a chancellor before whom the witnesses were produced in open court will not be disturbed on appeal unless the court can say that such findings were clearly and palpably wrong.

2. CANCELLATION OF INSTRUMENTS, § 35*—*when evidence is sufficient to warrant relief.* On a bill to cancel a contract for the sale of land and to recover back the consideration paid thereunder, evidence as to the inadequacy of the consideration and the situation of the parties considered and *held* to show that the statements made to complainant by defendant's agent as to the value of the land were relied on by complainant and that they were so excessive as to be fraudulent, and to sustain a decree for complainant.

3. PRINCIPAL AND AGENT, § 113*—*when principal is bound by agent's acts.* Statements by an agent, whom the owner of land employs to sell the land, made to a prospective purchaser as to the value of the land, are within the scope of the agency and binding upon the owner.

4. CANCELLATION OF INSTRUMENTS, § 2*—*what does not prevent relief.* On a bill to cancel a contract for the sale of land and to recover the consideration paid thereunder, charging fraud, deceit and misrepresentation, the mere fact that complainant visited the land more than once before the contract was signed does not deprive him of the right of rescission where it appears that he had no knowledge of soils or crops nor of the character, value or productiveness of that land or other lands in the vicinity and did not know of the roads giving access to the land, but merely relied on the plat shown him by defendant's agent.

5. CANCELLATION OF INSTRUMENTS, § 26*—*when delay does not prevent relief.* On a bill by the purchaser to rescind a contract for the sale of land, where it appears from his evidence that he did not realize the untruth of the statements made to him as to the value of the land until shortly before the filing of the bill, that the bill was not filed until he had occupied the land something over 2 years, does not constitute such delay on his part as to relieve defendant from liability.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Heinrich et al. v. Norton et al., 219 Ill. App. 86.

Appeal from the Circuit Court of Kankakee county; the Hon. Arthur W. De Selm, Judge, presiding. Heard in this court at the April term, 1920. Modified and affirmed. Opinion filed October 12, 1920. *Certiorari* denied by Supreme Court (making opinion final).

Rathje, Wesemann, Hinckley & Barnard and Cratty Bros. & Flatau, for appellants.

John H. Beckers, for appellees; E. P. Harney, of counsel.

Mr. Presiding Justice Dibell delivered the opinion of the court.

Under date of September 7, 1917, J. W. Norton by John B. DeVoney, his agent, entered into a written contract with Ernst Heinrich and Ida Heinrich, his wife, by which the former agreed to convey to the latter by warranty deed certain real estate in Kankakee county for $12,500, or which $4,500 was payable upon the signing of the contract, $1,125 on or before 2 years after the date of the contract, and $1,125 on or before 3 years from that date, and upon receipt of said deed, the grantees were to execute notes for $6,250, due on or before 5 years from date with interest at 6 per cent per annum, payable semiannually, and were to pay all taxes and assessments legally levied on said land after 1918, and were to secure such remaining payment by a trust deed of said real estate. (These payments in fact make a total of $13,000.) It was provided that if the second party failed to make any payment or perform any covenant by them made, the contract could be forfeited at the option of the first party, and in that case all payments made by the second party should be forfeited and the first party should have the right to re-enter the premises. The contract was made obligatory upon the heirs and assigns of the respective parties. The down payment was made

by the conveyance by the second party to the stenographer of Norton of a piece of real estate in Chicago, occupied by the second party as a garage, the equity in which over and above an incumbrance thereon amounted to over $4,500. The second parties afterwards took possession of the premises and paid one instalment of interest. Afterwards Norton conveyed said real estate and other real estate to John A. Dickson, subject as to these premises to the contract thereon. Thereafter, the second party being in default of the second payment of interest, Dickson obtained from the second party a chattel mortgage on personal property on the land to secure said interest. Shortly thereafter Dickson declared a forfeiture and served upon the second parties a demand for possession of the premises. The second parties then filed a bill in equity, and afterwards an amended bill, against Norton and Dickson and others, in which they charged fraud and deceit and misrepresentation in the obtaining of said contract, and asked that the contract be canceled and also the chattel mortgage and note, and that defendants or one of them be required to return to them the consideration they had paid and pay them for the improvements complainants had placed upon the premises, and for other relief. The bill was answered by the respective defendants, and Dickson filed a cross-bill, asking that the original contract be forfeited and that possession of the premises be delivered to him. This cross-bill was answered, and the cause was tried before the chancellor and decided in favor of complainants. The court offered to permit Dickson to amend his cross-bill so as to have the equities between himself and Norton adjusted in the decree, but Dickson declined to make such amendment. There was a decree which found the issues in favor of the complainants and directed that Norton pay complainants $4,500, the down payment he had received, and also $5,000 for the improvements placed upon said real estate by the

complainants, less a mechanic's lien for $363.20, which Dickson had paid, leaving the amount to be paid on account of said improvements $4,636.60. The decree further provided that upon the payment of said sums to complainants by either Norton or Dickson or upon the filing and approval of an appeal bond, if appeal should be taken, the complainants surrender possession of said real estate to Norton or his assigns by the first day of March thereafter and release Norton and his assigns from the covenants contained in said original agreement. Norton and Dickson prayed an appeal which was allowed upon their filing an appeal bond in the penal sum of $12,000 with securities to be approved by the clerk. The cross-bill was dismissed, and a claim of lien by the Garden City Oil Company was denied and it prayed and was allowed an appeal. Upon the record here Norton and Dickson act as appellants, but we are unable to find any appeal bond in this record and are unable to know from the record what appeal, if any, was perfected, nor by whom. We shall assume that Norton and Dickson have brought the case here by appeal.

In determining the issues of fact it is necessary to inquire into the intelligence and experience of the respective parties to the contract. Norton was in the live stock commission business at the Stock Yards in Chicago and owned this land and other lands in the vicinity. The transaction was chiefly conducted on his part by John B. DeVoney, a real estate agent in Chicago, and his various agents and employees, including his brother, Joseph S. DeVoney, and Edmund Bill. Norton employed John B. DeVoney to sell this land. During the preceding 14 years DeVoney had sold $8,000,000 worth of real estate in Illinois, and $4,000,000 worth elsewhere. He had personally inspected this real estate and had a plat made by surveyors and had a blue print thereof which he exhibited to Heinrich. Heinrich was a Russian about 48 years of age when

this contract was made. His father had been on land in Russia. He worked with his father some on said land until he was 15 or 20 years old, and thereafter worked in some trade until he came to this country and Chicago about 11 years before this contract. He there engaged in the bricklaying business and afterwards went into the garage business. He never had any schooling in the English language and spoke and understood it very imperfectly. His inability to understand ordinary English is made much clearer by reading his evidence in the record than it can be by merely reading the condensed abstract. He knew nothing about soils or drainage or the raising of crops in this country. He wished to leave the garage business. He saw an advertisement of this land by DeVoney and went to the office of the latter, and talked the matter over with DeVoney and his agents, and returned several times, and went to Kankakee county and saw this land with employees of DeVoney. The evidence favorable to complainants tends to show that DeVoney and his agents told Heinrich that this was good land and worth $125 per acre, and that Heinrich believed what they told him. DeVoney showed him the blue prints, and showed him that the land in question in Section 13, owned by Norton, was subdivided into ten-acre lots, and showed him by the blue print that there was a public highway all the way around said Section 13 in which said land was located, and also through the center of it from east to west, and that of the ten lots which DeVoney was proposing to sell to him (which are the lots described in the contract), five were bounded on the north by a road and the other five on the south by a road. This ease of access to the premises by a public road was one consideration which induced Heinrich to buy. After several interviews DeVoney agreed to take for the first payment the equity of redemption in the garage of $4,500. Joseph S. DeVoney and Bill took Heinrich over the land and told

him that it was good land and worth $125 per acre. In going to the premises at that time they went through the woods and did not go by any public road, and the agents told Heinrich that they were going by a short road. In fact, there were no roads on any side of this section nor through the middle of it, and there was no access to this land owned by other people. Before the deal was closed Heinrich proposed to consult a lawyer. The agents of Norton persuaded him not to do this. This seems not to be denied. If he had employed a lawyer with that sense of professional duty required in *People v. Vollintine,* 264 Ill. 586, on pp. 604 to 606, such lawyer, finding Heinrich ignorant and inexperienced, would have been likely to ascertain the value of this land from some disinterested person in Kankakee county who knew it. He would also have discovered that the contract in fact called for $13,000 instead of $12,500.

When Heinrich afterwards made complaint to the vendor and his agents of the absence of roads, he was told that the road was coming, that there would be a road opened by public authority, and they presented him and he signed a petition to have roads opened to this land. At the trial no roads had been opened. Heinrich spent the winter of 1917-1918 with his family in a house some distance from this land. Afterwards he bought the house to move it upon the land, and then found that he could not move it, and was obliged to take it to pieces and move the material. He erected a house at a cost of $3,000 and a barn at a cost of $1,600 and some small sheds. He was able to raise very little on the ground the first year and but very little more the next year. The land in question is partly timber and partly clear. The timberland is higher than the other land and is composed of sand on which are scrub oak, shrubbery and small trees. Some witnesses thought the timberland was worth $10 per acre, others that the timberland would be worth just what the

timber could be sold for, less the cost of cutting and removing it, and that the timberland would be worth nothing after the timber was removed, it being apparently in the nature of sand barrens. Witnesses differed as to the amount of timberland, ranging from 40 per cent to 60 per cent of the whole. The clear land is so low that in the rainy season it is generally under water. It has a sandy loam soil 2 or 3 feet deep, underlaid by a deep vein of sand. Two of defendants' witnesses conceded that the land had very little value until drainage was established, and the ditch already there is insufficient to carry off the water. It was proved that insurance companies will not loan any money on this land or other land of the same character in the vicinity. Some witnesses estimated the value of the timberland at $10 or $15 per acre and of the clear land at $20 or $30 per acre. Witnesses for appellants value the land much higher, and real estate men from Chicago connected with De-Voney or defendants testified that the value of the land was $125 per acre. There was proof tending to show that DeVoney for Norton had sold a few lots in the same subdivision to other parties for $125 per acre. The names of those parties are in the record and they are mostly foreigners. We are not advised whether the sales to them were under similar circumstances to the sale to complainants.

In determining what conclusion to reach as to the real value of these premises when this contract was made in 1917 we must take account of the fact that the witnesses were produced in open court before the chancellor. Under such circumstances the decree will not be disturbed unless the court can say that the findings of fact by the chancellor were clearly and palpably wrong. It is so held in *Woods v. Youngren,* 272 Ill. 521; *Roche v. Roche,* 286 Ill. 336, and many other cases. We see no reason to say that the conclusion of the chancellor in this question of fact is clearly wrong,

but on the contrary are of opinion that it is clearly right. An examination of the testimony of the witnesses who were acquainted with the character of this land and its history satisfies us that the price at which this land was sold was at least five times its real value. Appellants contend that inadequacy of consideration is not alone sufficient to justify rescission. Such is the rule, as held in *Nichols v. Roach,* 276 Ill. 388, and many other cases. But there are exceptions to that rule. In *Dillman v. Nadlehoffer,* 119 Ill. 567, where the general rule above stated is fully recognized, it is also said: "Yet it is just as well settled, that where the contracting parties, for any cause, are not on equal terms, and such representations are gross exaggerations, resulting in an unconscionable bargain, equity will not hesitate to interpose in favor of the injured party." In *Witherwax v. Riddle,* 121 Ill. 140, the court said: "Mere inadequacy of price is not, *per se,* ground for setting aside a transfer of property, yet it may be so gross and palpable as to amount, in itself, to proof of fraud, and this, in connection with proof of imposition and misrepresentation on the part of the purchaser and his agents, will be sufficient to characterize the transaction as fraudulent, in a court of equity." That was a case of an exchange of lands. In *Murray v. Tolman,* 162 Ill. 417, much is cited from a Michigan case that applies to this question of value, and it was there held that misrepresentations of value, made in that case and relied upon to the great harm of the purchaser, furnished a sufficient justification for equitable interference. Applying this rule, the court in *Fecht v. Freeman,* 251 Ill. 84, said: "The inadequacy of consideration for the transfer of said farm from John Fecht to Gus T. Freeman is so great as to shock the conscience of a court of equity and stamp the whole transaction with fraud from its inception to its close, and the evidence is convincing and well-nigh conclus-

ive that John Fecht was the victim of Geddes and Freeman." There are other cases in Illinois to the like effect. We are of opinion that the statements made to Heinrich by the agents of Norton as to the value of these premises were so grossly excessive as to be fraudulent, and that they were relied upon by Heinrich in making his purchase. The statements made by these agents were within the scope of their agency and are binding upon Norton. *Hahl v. Brooks,* 213 Ill. 134. Heinrich's possession was notice to Dickson of all the legal and equitable rights of Heinrich. *German-American Nat. Bank v. Martin,* 277 Ill. 629, and cases cited on p. 649. Defendants contend that the fact that Heinrich went upon these premises several times before he signed the contract deprives him of any right of rescission. In *Voorhees v. Campbell,* 275 Ill. 293, where a similar question was raised, the court said, on p. 326: "While it is true that he made a visit to Chicago and inspected the property, he knew nothing of its value except from the information which he secured from defendants in error. * * * Plaintiff in error did not discover the fraud practiced upon him until the filing of this bill, and he cannot therefore be held to have ratified or affirmed the transaction." Though Heinrich visited this land more than once before he signed the contract, he had no knowledge of soils or crops nor of the sandy character of this land nor of its actual value, and he did not know that no good crops had been raised upon that land or similar land in that immediate vicinity for many years, as shown by the proofs favorable to complainants, and did not know that good crops could not be raised thereon under the conditions then existing; and he also did not know that there were no roads by which he could get to the land, but relied upon the plat shown him in Chicago by the seller's agents, indicating all needed highway facilities.

Defendants also contend that the delay in filing this

bill relieves them from liability in this case. It is obvious from reading the evidence of Heinrich in the record that a realization of the untruth of the statements made to him as to the value of this land did not come to Heinrich until shortly before he filed this bill, and what we have above quoted from *Voorhees v. Campbell, supra,* shows that such a delay does not bar relief.

There is one respect in which we are of opinion the decree must be slightly modified. The court fixed the value of the improvements put upon the real estate by complainants at $5,000 and deducted therefrom $363.20 for a claim for mechanic's lien paid by Dickson, and required the rest of the value of said improvements to be paid by Norton. Heinrich in testifying did once estimate the total value of those improvements at $5,000 and included therein the value of some sheds, but those had been destroyed by fire and Norton could not be required to pay for them. But elsewhere in his testimony, Heinrich clearly showed an expenditure of $3,000 upon the house and $1,600 upon the barn; and that is all appellees claim in their brief. The estimate in the decree is therefore $400 too great. The sum of $4,636.80, required by the decree to be paid by Norton for said improvements, should be reduced by $400 and that amount should read in the decree $4,236.80. The decree will be modified in that respect by the court below; and in all other respects it is affirmed.

*Modified and affirmed.*