Vaden Veazey, Appellee, v. Charles Summers et al., Appellants.

Gen. No. 40,369.

Heard in the second division of this court for the first district at the October term, 1938. ▮▮▮▮ Opinion filed April 2, 1940.

COCHRANE & GEORGE, of Chicago, for appellants.

JOSEPH E. WINTERBOTHAM, of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Defendants, Charles M. Summers, Henry Schuh and John Connell, seek reversal of a decree which found that they, together with Edward McCormick (who does not join in the appeal), had by means of false and fraudulent representations and practices, induced plaintiff to purchase certain subdivided lots or parcels of land, situated in Cook county, and ordered them to return specific sums paid by her on account of these purchases, in addition to other relief granted. The decree, following the master's report and recommendations, specifically found that malice was the gist of the action, and ordered, among other things, that execution on a *capias ad satisfaciendum* issue against the several defendants.

From the testimony adduced before the master it appears that plaintiff had operated a beauty shop on North Clark street, Chicago, for some 16 years prior to 1927. She was then 45 years of age and had the equivalent of a high school education. Prior to the series of transactions with defendants, she had bought subdivided property in Niles Center on contract from A. A. Lewis & Co., subdividers. In November, 1927, defendant McCormick visited her place of business to solicit the sale of her beauty shop. As the result of conversations had with him, she visited the principal offices of Summers and Schuh, in the McCormick build-

ing on Michigan boulevard, Chicago. She was there conducted to McCormick's desk and told him of her dissatisfaction with the lots she had purchased from Lewis & Co. in Niles Center. McCormick told her of the subdivided lots in Harvey, Illinois, which he described as attractive investments, and on the following Sunday plaintiff accompanied McCormick to Harvey where she inspected the lots and entered into three transactions with defendants involving the purchase of lots on Western avenue and 150th place for $17,500; lots on Dixie Highway, also in Harvey, for $22,750, and lots on Wood boulevard in Harvey for $25,000.

It is urged at the outset that McCormick was a free-lance real estate broker and was never employed as salesman for defendants Summers and Schuh. The facts disclose that when plaintiff first visited the office of Summers & Schuh she was ushered to McCormick's desk, had a lengthy conversation with him and thereafter accompanied McCormick to the subdivision office at 150th place and Western avenue, where she inspected the subdivided lots and entered into the first contract. On this occasion she had lunch at Summer's office and it was late in the afternoon when she returned home. Summers, Schuh and McCormick were in the automobile which conveyed her back to the city. Summers got out of the car on the way back, and Schuh and McCormick drove her to her home on the north side. McCormick requested $200 as earnest money on the first transaction and on the evening of that day plaintiff gave him this sum, for which she obtained a receipt made out on a partially printed blank signed by McCormick as salesman for Summers & Schuh. On the top of this receipt there appears the printed legend: "SUMMERS & SCHUH—Union Bank of Chicago—Trustee. MCCORMICK BLDG., 332 S. Michigan Ave., Chicago," and on the bottom of the blank, the words, "MAKE CHECKS PAYABLE TO—SUMMERS & SCHUH."

In order to finance the first transaction plaintiff delivered to McCormick 24 shares of Sears Roebuck stock, which were sold by Summers & Schuh for her account for the net amount of $2,430.82. The receipt given for the stock was signed: "Summers & Schuh, Per E. C. McCormick," and Bristol & Company, the brokers who negotiated the deal, sold it on account of Summers & Schuh. This transaction required plaintiff to make monthly payments of $100 each. In examining the exhibits introduced in evidence we find a number of them signed by Summers & Schuh, "By M. C. Johnson," and others by Summers & Schuh, "per E. C. McCormick." Defendants take the position that McCormick had a broker's license and that he, like numerous other brokers, was privileged to sell lots in any of the Summers & Schuh subdivisions, but that he was not their salesman. McCormick testified that he sold Summers & Schuh property on commission, and that beginning in 1927 he was salesman for Summers & Schuh for two or three months, receiving 8 per cent on sales, and later, as sales manager for four or five months, he received 14 per cent commission. It is also argued by defendants Summers and Schuh that forms of receipts, similar to the one given to plaintiff, for the $200 which she first paid were printed and bound in pads and left on the desks in their office so that any broker might have access to them. Even if this were true, the subsequent receipts given plaintiff and the evidence adduced before the master clearly indicate that McCormick was a salesman in the employ of defendants Summers and Schuh, and the master and court were fully justified in so finding.

The first transaction entered into between the parties involved three lots on the corner of 150th place and Western avenue, purchased by plaintiff for $17,500. The false representations alleged to have been made with reference to this subdivided property were that (1) an opposite corner had sold for $400 a

foot; (2) that a contract had been let for paving Western avenue; and (3) that the lots were worth $400 a foot. Preceding this transaction McCormick displayed to plaintiff a "dodger," which bore at the top the following legend: "WESTERN AVENUE THE STREET WHICH MADE INVESTORS FORTUNES. PRICES BELOW ARE QUOTED BY OLCOTT GUIDE AND OTHER REAL ESTATE APPRAISERS FROM ACTUAL SALES." In two columns underneath this legend appear the comparative prices purporting to have been based on actual sales made in 1923 and 1928. One of the items in this table shows that lots at 150th and 151st streets had in 1923 sold for $20 a foot, and in 1928 sold for $400 a foot, showing an increase of 2,000 per cent. At the foot of the dodger appears the following: "THE ABOVE PRICES ARE COMPILED FROM SALES MADE ON THIS STREET. NO ONE SHOULD BE SO SKEPTICAL AS TO DOUBT THE FUTURE OF THIS LONGEST STREET IN CHICAGO. A FEW PARCELS CAN YET BE BOUGHT AT $150.00 TO $200.00 PER FOOT, ON TERMS NEVER BEFORE QUOTED. DON'T LET AN OPPORTUNITY SLIP BY THIS TIME! —GET YOUR FOOTHOLD—SUMMERS & SCHUH." To show the falsity of the representation that the corner opposite the lots purchased by plaintiff had been sold for $400 a foot, her counsel produced in evidence the so-called Heaford contract, showing the sales price of lots in the immediate vicinity to have been $226 a foot.

With reference to the representation made as to the paving of Western avenue plaintiff testified that McCormick told her that a contract had theretofore been let for this improvement. To establish the falsity of the representation plaintiff produced Frank E. Foster, city attorney of Harvey, and Paul G. Robertson, the city engineer. Foster testified that no contract had been prepared for the paving, and Robertson, the city engineer, stated that no plans had been made for paving Western avenue. No evidence was offered to rebut this testimony. Defendants argue that this was a representation of law, but this contention is untenable.

If the statement was made by McCormick that a contract had theretofore been let for paving Western avenue, it was a representation of fact, which would undoubtedly have entered materially into the inducement made to procure the purchase of these lots by plaintiff. McCormick, of course, denied having made the statement, but the master and chancellor were evidently of opinion that the representation had been made.

The third element of fraud and deceit complained of is that the three lots purchased by plaintiff on Western avenue had a fair cash market value of $400 a foot. To establish the falsity of this representation plaintiff produced eight real estate men, all of whom, except one, resided or had offices in Harvey. They placed valuations on the 75 feet purchased by plaintiff on Western avenue as ranging from $733 to $4,500. Their average valuations on these lots were $2,529. The sales price was $17,500, and plaintiff contends that she was overcharged to the extent of $14,971; in other words that the value of these parcels of land was about 17.5 per cent of the price charged, and that this was so grossly excessive as to be of itself sufficient evidence of fraud. Defendants produced no evidence to rebut these valuations; they merely denied that any such representations were made, but the master, whose findings were approved by the chancellor, found otherwise.

The second transaction between the parties was consummated in January, 1929. With reference to this transaction plaintiff contends that McCormick, who had by this time been advanced to the position of sales manager for Summers & Schuh, represented that no property in the Summers & Schuh subdivision on Dixie highway had sold for less than $550 a foot; that the Olcott Guide valued the property at $500 a foot; and that the fair cash market value was $550 a foot. In connection with this transaction plaintiff produced

the contract of Margaret Kelly for lots 8, 9 and 10 in block 1 of that subdivision, dated November 8, 1926. This property was on the northwest corner of 149th place and Dixie highway. The aggregate price paid by Mrs. Kelly for the three lots was $18,500, and there being 98 feet it amounted to $188 a foot.

With reference to the representation that the Olcott Guide had valued the Dixie highway lots at $500 a foot, a stipulation was entered into between the parties upon the hearing that Olcott's Guide did not value any property south of 138th street, east or west of Western avenue. In view of this stipulation it is obvious that if the representation was made it was untrue.

In connection with the representation that the fair cash market value was $550 a foot, plaintiff again produced the same eight real estate appraisers whose valuations ranged from $1,100 to $8,300 for the property purchased by plaintiff, making an average valuation of $5,742. The sales price for the lots in the Dixie highway subdivision was $22,750. Plaintiff contends that there was an overcharge of $17,008, which was so grossly excessive as to constitute fraud. Here again defendants denied that the representations were made, but the master found otherwise.

The third transaction covered 13 lots on Wood boulevard sold to plaintiff for $25,000. The deed when delivered to plaintiff conveyed lots on Page avenue instead of Wood boulevard. Page avenue was an untraveled street. Defendants took the position that this conveyance was a mistake and offered to rectify it upon the hearing. In connection with this transaction defendant Connell, who was also a salesman for Summers & Schuh, and McCormick received from plaintiff a cashier's check for $2,500. Summers & Schuh claimed to have no interest in this transaction and took the position that it was an independent venture by Connell and McCormick. When this suit was instituted Mildred Winans and Della Leonard were made

defendants because they had previously owned these lots and it was not known what interest they had in the transaction. The same attorney who represented Summers & Schuh appeared for them and filed their answers. They were later served with subpoena to appear as witnesses. Before testifying they consulted with the law firm of Cutting, Moore & Sidley, and were advised that they needed an attorney to represent them. They thereupon retained Warren Pease, who was substituted as counsel. When called to testify they produced an exhibit appearing on the letterhead of Summers & Schuh, subdividers, showing receipt from them of a quitclaim deed for the lots which were the subject of the Wood boulevard transaction. When plaintiff purchased these 13 lots she gave Connell a cashier's check for $2,500. Connell in turn delivered it to McCormick. Earlier in the hearing Summers had testified "that he received no part of the $2,500; that he never got a dime; that he knew nothing about the transaction pertaining to the Wood boulevard lots, until he was arrested and taken to the Criminal court." When McCormick and Connell took the stand as witnesses they were cross-examined as to the disposition of the $2,500 in an effort to show that Summers & Schuh had received part of the money. Before testifying McCormick had made an affidavit dated September 19, 1930, wherein he stated that on the completion of the sale of the lots supposed to be on Wood boulevard he took $1,000 in currency to the office of Summers & Schuh and personally gave it to Summers; that Summers congratulated affiant for having made the deal, and thereupon disbursed the $1,000 as follows: $333 to Connell, $500 to McCormick, and retained the sum of $166.67. Because of the discrepancies in the testimony of Connell and McCormick the exact facts could not be ascertained from their evidence, but later in the hearing one Raymond Fitzgerald, a former salesman and employee of Summers &

Schuh, testified that Connell had told him what disposition was made of the $2,500. Fitzgerald testified that another salesman, named Sanders, knew that McCormick and Connell were selling the real estate to plaintiff and that they were concealing it from Summers, and Sanders thereupon "tipped Summers off to it," and that Summers came in excited and "was going to give him [Connell] the devil"; that McCormick afterward learned that Summers knew about it and thereupon agreed with Connell to tell Summers that they got only $1,000, "so that if they had to split with Summers, he would not get so much." It was subsequently shown from records of the Jackson Park National Bank and the Irving State Savings Bank, that Summers & Schuh participated in this transaction to the extent of $166.67, being their share of the $2,500 cashier's check delivered to Connell and McCormick. The explanation for the amount of this item is that the distribution was made upon the misrepresentation of McCormick and Connell to Summers that only $1,000 in currency had been obtained from plaintiff.

According to plaintiff's testimony the 13 lots on Wood boulevard were represented to be worth $32,500, or $100 a foot, and she was led to believe that she was receiving a bargain at $25,000, the sales price. She had paid on account of this purchase $2,500 cash, and had made a mortgage to the sellers in the sum of $10,000, and she received certain credits for other real estate contracts surrendered by her. Mildred Winans and Della Leonard, who had been the owners of the property, did not know that it was being sold for $25,000, nor were they advised that $2,500 cash on account had been paid; neither did they know that plaintiff had turned over one contract on which she had paid $9,000, and a note for $3,500. As a result of these concealments they had parted with their title and had a $10,000 mortgage back. Upon the hearing McCormick and Connell testified that they were to receive all over

$10,000. McCormick tore up the $3,500 note from plaintiff and returned to her the Lewis contract on which she had paid $9,000. All this was done subsequent to the time when Connell in a conversation with plaintiff told her that she had been "gypped out of her eye teeth." After the transaction was consummated and before plaintiff discovered that she had not been deeded the lots on Wood boulevard, but on another street, she had paid $300 interest on the $10,000 mortgage, and the master found that she was entitled to recover from Connell $3,977.54, with interest, which is made up of the following items: $2,500 cash; $300 interest; and the amount of a judgment for $1,000 with interest, aggregating $1,177.54, which plaintiff had theretofore suffered. The master also found that she was entitled to recover from McCormick, Summers and Schuh, the aggregate amount of $8,875.58. As to the Wood boulevard transaction the same eight real estate appraisers testified that the 13 lots purchased by plaintiff had a fair cash value ranging from $3,250 to $8,450, or an average of $6,236. The sales price for this property was $25,000, and plaintiff takes the position that the overcharge of $18,774 was so grossly excessive as to constitute fraud.

The brief recital of the circumstances attending these transactions is taken from a voluminous record. Defendants, of course, denied the representations alleged to have been made, and they argue that if such representations were made they were representations of law and not of fact, and constituted opinions, trade talk, puffing, and promises of future profits, and are therefore not fraudulent. We have set forth the fraud and deceit claimed with reference to each transaction, and although there may have been some element of opinion, puffing, exaggeration and promise of future profits made in the course of the various conversations with plaintiff, it is evident from the dodger hereinbefore described and from the grossly excessive prices

paid by plaintiff for these various lots, pursuant to false representations made to her, that she was greatly overreached. In connection with the Wood boulevard property it is apparent that defendants McCormick and Connell had entered into an agreement to withhold the facts from their principal, Summers & Schuh, and that the latter participated in the division of the down payment and retained part of the proceeds. The master who heard the evidence and had an opportunity to observe the witnesses found that plaintiff had sustained her bill, and a careful examination of the record convinces us that his findings are amply supported by the evidence. Various legal propositions are advanced by defendants as ground for reversal. At the conclusion of these various transactions, plaintiff had become so financially exhausted that she told defendants that she wanted to be through with the whole thing and asked them to make an adjustment. After lengthy conferences with defendants she deeded back the lots purchased at 150th place and Western avenue and the Dixie highway property, and assigned all of her interest in the contracts to Summers & Schuh, who in turn gave her a credit of some $8,000 which could be applied on the purchase of other lots in any of their subdivisions within the period of one year, and it is argued that because she deeded back this property plaintiff cannot maintain her action. The cases cited in support of this proposition deal with circumstances where individuals deeded property to third persons and then, claiming to have been defrauded, sought restitution. Such were the circumstances in *Fisher v. Burks,* 285 Ill. 290, and *Rubinelli v. Envoy Bldg. Corp.,* 264 Ill. App. 94. In the case at bar, however, Summers & Schuh received back the title; it was not conveyed to third persons, and when plaintiff reconveyed the lots to defendants, she did not know of the alleged frauds that had been practiced on her. She discovered the false representations later and now invokes the doctrine that under the circumstances of this record

"fraud vitiates everything it touches." After the lots had been reconveyed to defendants, plaintiff still owed them some $17,000. The evidence is clear that she did not know until late in October, 1929, of the fraud that had been practiced on her, and this was subsequent to her deeding the property to Summers & Schuh, and after the letters of credit had been given to her. Defendants argue that she should have known or investigated the circumstances of these various transactions and the frauds of which she complains before she deeded the property back to them. These transactions may show her gullibility, but they do not preclude a court of equity from affording relief in view of the overwhelming evidence of fraud presented by this record.

It is urged that to justify a court of chancery in canceling contracts on the ground of fraud and decreeing the repayment of money it is necessary that the proof must be of such a clear and convincing nature that the mind is well satisfied that the charge is true, and that the alleged misrepresentations must relate to a material matter. While these elementary propositions of law may be conceded it is apparent that the proof presented by the record is so clear and convincing as to justify the decree entered. The representations made were material. Questions of value, when grossly exaggerated, may constitute fraud. (*Schwarz v. Reznik*, 257 Ill. 479; *Heinrich v. Norton*, 219 Ill. App. 86.) And certainly representations as to actual sales and that contracts existed for paving the highway adjacent to the property, are not representations of law but material representations of fact which may be the basis for rescission on account of fraud.

In conclusion it is argued that the special finding of malice was not justified because there was no allegation of malice. However, the complaint alleged that certain values were represented to be market values; that certain lots had been sold for certain prices; that a contract had been let for paving; that Olcott's Guide

valued the property in question; that plaintiff was unfamiliar with values in Harvey, relied on the representations, not knowing them to be false; that they were false; and that she paid her money upon the faith of the representations made. It seems to us that these allegations when sustained by proof satisfactory to the master and chancellor bring the case within the classification of wrongs showing evil intent, design or purpose, and imply that the guilty parties were actuated by improper motives. The false "dodger" issued by Summers & Schuh; the representations of McCormick; the deceit of McCormick and Connell, practiced upon their own principal, as well as plaintiff, and the participation by Summers & Schuh in the moneys paid by plaintiff, all so closely interwoven as to really constitute one continuing transaction, indicate circumstances upon which a finding of malice may be predicated. (*Corwin v. Tillman,* 255 Ill. App. 230; sec. 5, ch. 77, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 107.155].)

This case was tried at length before the master. Voluminous testimony was adduced. The master went to Harvey to hear the evidence as to the valuations and the hearing was fairly conducted. Defendants make no contention that any errors were made in the reception or exclusion of evidence. We find no convincing reason why the decree should be reversed; it is therefore affirmed.

*Decree affirmed.*

SULLIVAN, P. J., and SCANLAN, J., concur.